IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT J. SCOFIELD, | ) | 1:25-cr-95 (LMB) |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

As issue in this Memorandum Opinion is defendant Robert Scofield's Motion to Dismiss Indictment Pursuant to His Second Amendment Right to Keep and Bear Arms ("Motion to Dismiss"), in which he challenges the constitutionality of 18 U.S.C. § 922(n). [Dkt. No. 25]. Scofield argues that the statute is facially unconstitutional under the Second Amendment and that it, at a minimum, violates the Second Amendment as applied in this case. After hearing oral argument, the Court denied the Motion to Dismiss from the bench; this Memorandum Opinion explains the reasons for that decision in more detail.

I.

Scofield was indicted on February 5, 2025 in Marion County, Oregon for being a felon in possession of a firearm. [Dkt. No. 35] at 1.[1] The next month, Scofield shipped a disassembled handgun through the United States Postal Service from Washington State to a District of

---

[1] The predicate felony for this Oregon state crime was a Washington State conviction for a controlled substance offense. Although Scofield argues that this Washington State conviction could not sustain a charge under the federal felon in possession statute, 18 U.S.C. § 922(g)(1), he concedes that it is a sufficient predicate offense under the Oregon criminal statute, O.R.S. § 166.270. See [Dkt. No. 25] at 2. There is therefore no dispute that Scofield was under felony indictment during the events in question. See [Dkt. No. 35] at 1.

Columbia ("D.C.") hostel.  See id.[2]  Scofield then traveled to the D.C. hostel, where he received and reassembled the handgun.  See id. at 2.  While at the hostel, Scofield also traveled to Maryland to purchase 9mm ammunition, which he brought back to D.C. and loaded into the handgun.  Id.

On March 19, 2025, Scofield transported the loaded handgun from D.C. to the CIA Headquarters' main entrance in McLean, Virginia.  Id.  While standing in a crosswalk, Scofield fired four rounds from the handgun onto the grounds of the CIA Headquarters.  Id.  Scofield then pointed the still-loaded handgun at his head, walked to a nearby bench, and sat down.  Id. at 2–3. Law enforcement responded to the area and spoke to Scofield for several hours while he remained seated with the handgun pointed at his head.  After an hours-long standoff, Scofield surrendered.  Id. at 3.

Scofield was indicted in this district on May 15, 2025 for violation of 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(n).  It is undisputed that Scofield transported a firearm and ammunition in interstate commerce while knowingly under felony indictment.  See [Dkt. No. 35] at 1–3.  Scofield therefore challenges the indictment

---

[2] After his Motion to Dismiss was denied, Scofield entered a conditional Federal Rule of Criminal Procedure 11 plea that allowed him to appeal the denial.  The written statement of facts to which Scofield agreed describes Scofield shipping the firearm from Washington State to D.C.; however, while discussing the statement of facts at his plea colloquy on July 18, 2025, Scofield refined that admission, explaining that he had disassembled the handgun before shipping its parts to D.C., then reassembled it in D.C. before he brought it to Virginia.  This refinement does not change the posture of the case, because Scofield admitted that he transported a fully assembled firearm capable of firing bullets from D.C. to Virginia.

solely on Second Amendment grounds, arguing that his conduct is covered by the Second

Amendment's plain text and that the government cannot show that § 922(n) is consistent with the

United States' historical tradition of firearms regulation, as required by New York State Rifle &

Pistol Ass'n v. Bruen, 597 U.S. 1 (2022).

II.

The Second Amendment provides, "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend. II.  In Bruen, the Supreme Court set out a two-step approach for analyzing

whether a firearms regulation is valid under the Second Amendment.  597 U.S. at 17.  First,

courts assess whether "the Second Amendment's plain text covers [the] individual's conduct" at

issue.  Id.  Second, if an individual's conduct is covered by the plain text of the Second

Amendment, "a firearm regulation" is only constitutional if it is "consistent with this Nation's

historical tradition of firearm regulation."  Bruen, 597 U.S. at 17.  Because "a challenged

regulation" need not "precisely match its historical precursors," United States v. Rahimi, 602

U.S. 680, 692 (2024), the government must only "identify a well-established and representative

historical analogue, not a historical twin" to save the regulation.  Bruen, 597 U.S. at 30.  To

gauge whether historical firearm regulations are "relevantly similar" to the regulation at issue,

courts look to both "how" and "why" the historical regulations burdened a citizen's Second

Amendment right, and seek to "apply[] faithfully the balance struck by the founding generation

to modern circumstances."  Id. at 29.

In applying the Bruen test, courts are to recognize that, "[l]ike most rights," "the right

secured by the Second Amendment is not unlimited," and that "the right [i]s not a right to keep

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  United

States v. Rahimi, 602 U.S. 680, 691 (2024) (quoting District of Columbia v. Heller, 554 U.S.

3

570, 626 (2008)).  Therefore, "the appropriate analysis involves considering whether the
challenged regulation is consistent with the principles that underpin our regulatory tradition." Id.
at 692 (citing Bruen, 597 U.S. at 26–31).

The Fourth Circuit has applied the two-step Bruen test to uphold a federal statute that
prohibits being a felon in possession of a firearm, United States v. Hunt, 123 F.4th 697 (4th Cir.
2024) cert. denied, No. 24-6818 (U.S. June 2, 2025) (upholding 18 U.S.C. § 922(g)(1) against as-
applied challenge) and United States v. Canada, 123 F.4th 159, 161 (4th Cir. 2024) (upholding
§ 922(g)(1) against facial challenge); a federal statute prohibiting possession of a firearm after
being convicted of a misdemeanor domestic violence offense, United States v. Nutter, 137 F.4th
224 (4th Cir. 2025); a federal statute prohibiting possession of a firearm with an obliterated serial
number, United States v. Price, 111 F.4th 392, 397 (4th Cir. 2024) (en banc), cert. denied, 145 S.
Ct. 1891 (2025); a federal statute prohibiting commercial sale of handguns to individuals
younger than twenty-one years old, McCoy v. Bureau of Alcohol, Tobacco, Firearms &
Explosives, 140 F.4th 568 (4th Cir. 2025); a Maryland statute imposing a safety course and a
time delay as conditions on purchasing a handgun; Maryland Shall Issue, Inc. v. Moore, 116
F.4th 211 (4th Cir. 2024) (en banc), cert. denied, 145 S. Ct. 1049 (2025); and a Maryland statute
prohibiting the possession of military-style assault weapons, Bianchi v. Brown, 111 F.4th 438,
441 (4th Cir. 2024) (en banc), cert. denied, 145 S. Ct. 1534 (2025).  In addition, a Fourth Circuit
panel has held that it was not plain error to enhance a sentence based on an 18 U.S.C. § 922(n)
conviction when the sentence was issued a week after Bruen was published, and cited the Fifth
Circuit for the proposition that "[t]here is no binding precedent holding § 922(n)
unconstitutional." United States v. Claybrooks, 90 F.4th 248, 256 (4th Cir. 2024).

Although the Fourth Circuit has yet to opine on the constitutionally of  § 922(n) de novo,
courts have generally upheld § 922(n) in the face of post-Bruen Second Amendment challenges.

4

The Fifth and Sixth Circuits, which are the only circuits to address the constitutionality of § 922(n) since Bruen, both rejected facial challenges to the statute. United States v. Quiroz, 125 F.4th 713 (5th Cir. 2025); United States v. Gore, 118 F.4th 808 (6th Cir. 2024). The Ninth Circuit engaged in similar reasoning to reject a Second Amendment challenge to a pretrial release condition that barred defendants from possessing firearms. United States v. PerezGarcia, 96 F.4th 1166 (9th Cir. 2024). District courts, too, have more often than not upheld § 922(n) against Second Amendment challenge. See United States v. Jackson, 661 F. Supp. 3d 392 (D. Md. 2023);[3] United States v. Alston, 699 F. Supp. 3d 424 (E.D.N.C. 2023); United States v. Brown, 731 F. Supp. 3d 1326 (M.D. Ga. 2024); United States v. Rowson, 652 F. Supp. 3d 436 (S.D.N.Y. 2023); United States v. Bartucci, 658 F. Supp. 3d 794 (E.D. Cal. 2023); and United States v. Kays, 624 F. Supp. 3d 1262 (W.D. Okla. 2022) (each upholding § 922(n) as constitutional). But see United States v. Stambaugh, 641 F. Supp. 3d 1185 (W.D. Okla. 2022); United States v. Hicks, 649 F. Supp. 3d 357 (W.D. Tex. 2023); and United States v. McDaniel, 2024 WL 3964339 (E.D. Wis. Aug. 28, 2024) (each holding § 922(n) to be unconstitutional).

III.

Assuming that the Second Amendment's plain text covers the conduct at issue, the government has met its burden under Bruen step two because 18 U.S.C. § 922(n) is consistent with three different founding-era regulatory traditions: (1) restrictions on the interstate transportation of firearms and munitions; (2) disarming persons under felony indictment; and (3) barring possession of firearms by a category of persons that the legislature has deemed to present an unacceptable risk of danger if armed.

---

[3] A Fourth Circuit panel held oral argument on an appeal of United States v. Jackson on May 8, 2025.

First, the government has shown that there is a founding-era tradition of restricting the interstate and inter-jurisdictional transport of firearms and their dangerous accessories by pointing to numerous colonial and state statutes from the founding era that restricted the transportation of firearms and gunpowder.  For example, in 1776, Maryland prohibited muskets or rifles from being exported to other colonies without the exporter first obtaining government approval, and Connecticut prohibited the transportation of gunpowder out of the colony the year before.[4]  The Third Congress similarly made it unlawful to "export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulfur, or saltpeter."  Act of May 22, 1794, 1 Stat. 369, ch. 33, sec. 1 (spelling modernized).  Seizures of firearms and gunpowder occurred under this law, and a jurisdictional issue pertaining to one such seizure made its way up to the Supreme Court.  See United States v. La Vengeance, 3 U.S. 297, 297–98 (1796) (holding that a defendant was not entitled to a jury trial when the government sought to seize a vessel that had unlawfully exported arms and ammunition).  Multiple other states and colonies restricted the interstate transportation of firearms and munitions.[5]  The passage and enforcement of all these statutes "demonstrate the

---

[4] Charles J. Hoadly, ed., 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (No "gun-powder made and manufactured . . . in this Colony . . . shall be exported out of the [Colony] by land or water without . . . license."); Proceedings of the Convention of the Province of Maryland, (1836) (1776 statute) ("Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of this province, without the leave of the council of safety.").

[5] See, e.g., E. B. O'Callaghan, ed., Laws and Ordinances of New Netherland, 1638–1674: Compiled and Translated from the Original Dutch Records in the Office of the Secretary of State, Albany, N.Y. (1868) (1645 statute) ("Therefore, we most expressly forbid, as we hereby do, all persons, from this time forth, from daring to trade any munitions of War with the Indians, or under any pretence whatsoever, to transport them from here, without express permission, on pain of being punished by Death."); William H. Whitmore, ed., The Colonial Laws of Massachusetts: Reprinted From the Edition of 1660 With the Supplements to 1672 186 (1889) (1651 statute) ("[N]o perso[n] . . . shall transport any Gunpowder out of this Jurisdiction, without

expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders." United States v. Libertad, 681 F. Supp. 3d 102, 114 (S.D.N.Y. 2023).

Section § 922(n), as applied to Scofield, fits comfortably within this historical tradition of regulating the interstate transportation of firearms. After he was indicted in Oregon for a felony firearms offense, Scofield was prohibited from shipping or transporting firearms in interstate commerce. This prohibition is directly analogous to the founding-era colonial governments' regulations, which often required a license to transport a firearm, gunpowder, or munitions, and in at least one instance prohibited their transfer generally. See, e.g., New Netherland 1645, supra; Massachusetts 1651, supra; Connecticut 1775, supra; Maryland 1776, supra.

Second, there is a historical tradition of depriving citizens of firearms after they had been indicted by a grand jury for a felony offense. At the founding, states often detained and disarmed felony indictees pending trial without providing any individualized process. See Gore, 118 F.4th at 816 ("[A]bout half of the States at the time of the founding made serious offenses nonbailable."). In some of the states where courts were permitted to grant bail for serious offenses, bail nonetheless "became unavailable (barring exceptional circumstances) once a grand jury returned an indictment establishing probable cause." Id. (citing People v. Tinder, 19 Cal. 539, 541–46 (1862)). And "once detained, criminal defendants were completely disarmed." Perez-Garcia, 96 F.4th at 1182. Thus, as every Circuit to confront the issue has held, § 922(n) is

_____

License first obtained, from some two of the Magistrates."); The Charter and Ordinances of the City of Providence (1845) (1821 statute) ("An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder"); 9 Laws of New Hampshire: Second Constitutional Period 461 (1921) (1825 statute) ("An Act to Regulate the Keeping and Selling, and the Transporting of Gunpowder."). Each founding-era statute referenced in this opinion is available at the Duke Center for Firearms Law's Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository-of-historical-gun-laws (last visited July 28, 2025).

consistent with the Nation's historical tradition of detaining persons under felony indictment pending resolution of the charge at trial. Quiroz, 125 F.4th at 718–25; Gore, 118 F.4th at 814–17; see also Perez-Garcia, 96 F.4th at 1182 ("[T]he historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.").

An analysis of "why" and "how" historical pretrial detention regulations burdened a citizen's right to armed self-defense confirms that § 922(n) is "relevantly similar" to these regulations. Bruen, 597 U.S. at 30. Both § 922(n) and founding-era pretrial detention of felony indictees have the same "why"—to protect the public from someone whom a grand jury has found probably committed a serious offense. In terms of "how," § 922(n) is much less restrictive than founding-era regulations. Instead of detaining someone post-indictment in a jail cell as a matter of course, § 922(n) only restricts the indictee's ability to transport, ship, or receive firearms during the "stressful and fraught period between indictment and resolution of a criminal case." Gore, 118 F.4th at 814. As the Supreme Court explained in Rahimi, a modern firearms regulation may use the less restrictive "how" of disarmament to achieve the same public safety "why" as an analogous historical regulation that favored the more restrictive "how" of incarceration. 602 U.S. at 682 ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament . . . is also permissible."); see also Hunt, 123 F.4th at 706 (discussing this "greater-includes-the-lesser theory" in Rahimi).

Scofield counters that the purpose of founding-era pretrial detention was to ensure the defendant's appearance at court proceedings, not to protect the public. See, e.g., Shima Baradaran, Restoring the Presumption of Innocence, 72 Ohio St. L.J. 723, 732–33 (2011). But as the Sixth Circuit concluded in Gore, the "purposes of th[e founding-era pretrial detention] system

8

were both to ensure the defendant's appearance at trial and to keep the public safe in the meantime." Id.; accord Quiroz, 125 F. 4th at 718. The mere fact that pretrial detention was additionally, or even primarily, focused on the defendant's appearance at court proceedings does not vitiate its important, additional purpose of protecting the public from someone whom a grand jury has determined to have probably committed a felony—the exact purpose of § 922(n). The statute is therefore consistent with the Nation's historical tradition of disarming those for whom a grand jury has issued a felony indictment.

Third and finally, there is a founding-era historical tradition of prohibiting the "possession" of arms "by categories of persons" deemed by the legislature to "present[ ] an unacceptable risk of danger if armed." United States v. Hunt, 123 F.4th 697, 707 (4th Cir. 2024) (upholding § 922(g)(1)'s prohibition on possession of firearms by persons who have been convicted of a felony); see also Heller, 554 U.S. at 626, 627 n.6 ("Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are "presumptively lawful measures"). As the Supreme Court suggested in Rahimi, individualized process is not required before restricting a person's gun rights, because the legislature may in certain instances "ban[] the possession of guns by categories of persons thought . . . to present a special danger of misuse." Rahimi, 602 U.S. at 698. At the time of the founding, class-wide restrictions on firearms possession often rested on odious and stereotypical assumptions of categorical dangerousness. See Hunt, 123 F.4th at 707 (stating that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," including "to address a [perceived] risk of dangerousness," and discussing laws disarming Native Americans, non-oath takers, and religious minorities such as Catholics and non-Anglican Protestants). Indeed, "most such laws would likely fail equal protection scrutiny today," Libertad, 681 F. Supp. 3d at 113; but they nevertheless show that founding-era

9

legislatures had broad authority, consistent with the Second Amendment, to disarm categories of Americans based on their perceived risk of dangerousness. See id.; Hunt, 123 F.4th at 707 (Even though the founding-era generations understood that "not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty . . . were violent or dangerous persons, all could be disarmed."). The Fourth Circuit relied on these historical analogues to uphold Congress's categorical prohibition on possession of firearms by felons, making clear that courts do not need to look felon-by-felon or felony-by-felony to prove dangerousness. See id. ("[T]here is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons.").

A grand jury indictment, like a felony conviction, is a reasonable basis for the legislature to deem someone dangerous and thus restrict their interstate transportation and receipt of firearms. For an indictment to be obtained, at least twelve grand jurors operating as objective factfinders must agree that there is sufficient evidence to charge someone with violating the law. See Kaley v. United States, 571 U.S. 320, 328 (2014) (stating that "an indictment fair upon its face, and returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged"). This process, like a felony conviction by jury, involves a group of randomly selected citizens making an individualized determination about whether a person violated the law. See id.

Although the procedural safeguards and unanimity requirement of the grand jury process are significantly less stringent than those needed for a felony conviction, the length and scope of § 922(n)'s deprivation of firearm rights is less stringent than § 922(g)(1)'s lifetime restrictions on firearms possession. Section 922(n)'s restrictions apply "only during the stressful and fraught period between indictment and resolution of a criminal case," Gore, 118 F.4th at 814, a period

10

limited in length by the Sixth Amendment's right to a speedy trial. See United States v. Hall, 551 F.3d 257, 271 (4th Cir. 2009) ("[T]he constitutional right to a speedy trial is triggered by an indictment."). Section 922(g)(1), conversely, is a lifetime prohibition. See 18 U.S.C. § 922(g)(1). Moreover, § 922(n) only regulates the interstate shipping, transport, and receipt of firearms, whereas § 922(g)(1) prohibits the possession of firearms, including those the felon already possessed before conviction. The comparatively limited restrictions on the right to bear arms that § 922(n) imposes only underscore its constitutionality. See Rahimi, 602 U.S. at 699 (finding that § 922(g)(8)'s constitutionality is supported by the facts that it "does not broadly restrict arms use by the public generally" and its "restriction was temporary" as applied to Rahimi).

## IV.

Scofield, knowing he was under felony indictment in Oregon, willfully transported a firearm and ammunition from D.C. to Virginia in violation of 18 U.S.C. § 922(n). Congress's decision to criminalize this activity is permissible under the Second Amendment because § 922(n) is consistent with this Nation's historical tradition of firearms regulation. For all of the foregoing reasons, Scofield's Motion to Dismiss has been DENIED.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

Entered this 6th day of August, 2025.

Alexandria, Virginia

/s/ _____

**Leonie M. Brinkema**
**United States District Judge**

11